IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA,

v.

CIVIL ACTION NO.
1:16-CR-00334-MHC-LTW

KENNETH PERRY,

Defendant.

## MAGISTRATE JUDGE'S FINAL REPORT AND RECOMMENDATION AND ORDER CERTIFYING CASE READY FOR TRIAL

This case is presently before the Court on Kenneth Perry's ("Defendant") Motion to Suppress and Motion to Suppress Statements. (Docs. 14, 15). This Court convened an evidentiary hearing with respect to the above-listed motions on February 23, 2017 (Doc. 18), after which Defendant submitted a post-hearing brief in support of his motions. (Doc. 19). The Government filed a response in opposition to Defendant's motions, to which Defendant replied. (Docs. 21, 22). Having considered Defendant's motions, the parties' briefs, and all supporting documents submitted, and for the reasons set forth below, this Court **RECOMMENDS** that Defendant's motions be **DENIED**. (Docs. 14, 15).

## BACKGROUND

On September 20, 2016, the Grand Jury entered a two count indictment against

Defendant, including one count of knowingly distributing at least one visual depiction of a minor engaging in sexually explicit conduct in violation of 18 U.S.C. § 2256(2), 2252(a)(2) and (b); and knowingly possessing a computer and computer storage device which contained at least one visual depiction of a minor engaging in sexually explicit conduct as defined in 18 U.S.C. § 2256(2), said depiction (a) having been produced using a minor engaging in sexually explicit conduct, (b) involving at least one prepubescent minor and at least one minor who had not attained 12 years of age, and (c) having been produced using materials which have been shipped and transported in and affecting interstate and foreign commerce, in violation of Title 18 U.S.C. § 2252(a)(4)(B) and 2252(b)(2).

## DEFENDANT'S MOTION TO SUPPRESS STATEMENTS

Defendant argues in his Motion to Suppress Statements that federal agents executing a search warrant at his residence placed him in custody and unlawfully questioned him without giving him <u>Miranda</u> warnings. Defendant also contends that the law should change to require law enforcement officers to secure a second search warrant before searching the contents of a computer.

## I.   FACTUAL BACKGROUND

### A.   Testimony of FBI Special Agent Scott Warren

On February 27, 2013, Special Agent Scott Warren ("Warren") of the Federal Bureau of Investigations (FBI), served as the case agent in a child pornography investigation in which Defendant became a subject. (Tr. of Feb. 23, 2014 Evid. Hr'g,

(Doc. 18), hereinafter "Tr.," at 4). Around July 2014, an undercover officer accessed a peer-to-peer file sharing program over the internet and observed files of child pornography being shared by an account in the name of KPerry1970. (Tr. 4). The undercover officer downloaded those files and captured the internet protocol ("IP") address. (Id.). According to Warren, an IP address is a unique identifier that provides a specific date, time, and location for a computer. (Id.). After the investigation revealed that Charter Communications ("Charter") assigned the IP address to KPerry1970, an administrative subpoena was sent to Charter. (Tr. 5). In response to the subpoena, Charter indicated that the IP address was registered to a computer located at a single family residence on 1364 Bywood Court in Suwanee, Georgia. (Id.). Law enforcement officers conducted records checks as well as surveillance of the residence, identified who they believed were the occupants of the residence, and applied for a federal search warrant. (Tr. 6).

At approximately, 6:50 a.m. on August 7, 2014, Warren and a team of approximately sixteen law enforcement officers, including FBI agents, Task Force officers, and Suwanee police officers executed a federal search warrant at Defendant's residence. (Tr. 6, 17). After knocking on the front door of the residence, announcing they were the police and the FBI, and they had a search warrant, Defendant's wife opened the door. (Tr. 6, 7, 17). With guns drawn, the officers conducted a protective sweep of the two story residence ensuring that it was secure. (Tr. 7). The protective sweep lasted approximately five minutes, and at the conclusion of the sweep, the officers

AO 72A
(Rev.8/82)

holstered their guns.  (Id.).  Defendant and his wife were the only occupants of the residence.  (Tr. 7).  The officers executed the search warrant and started to interview Defendant.  (Tr. 8).  Defendant's wife was escorted outside in front of the residence and Defendant, wearing a metal brace, was interviewed while sitting in a chair at a table on the rear deck of the residence.  (Id.).  Warren and FBI Special Agent Johanna Norman ("Norman") were seated at the table with Defendant during his interview.  (Id.).  Warren credibly testified that before the interview of Defendant started, Defendant asked for a ginger ale, was given a drink, and then advised that he was not under arrest, that he did not have to answer any questions, and that he was free to leave.  (Tr. 9).  Warren also credibly testified that he told Defendant that even if Defendant decided to answer any questions, Defendant could stop answering them if he wanted to do so.  (Tr. 9, 10). Although both Warren and Norman were wearing vest bearing the letters FBI, they did not have their FBI vests on during the interview of Defendant; instead, they were dressed in plain clothes with their weapons concealed under their clothes.  (Tr. 10).  Warren further credibly testified that during the interview of Defendant neither he nor Norman drew their weapons, no threats or promises were made to Defendant to induce him to talk, Defendant was never placed in handcuffs, and Defendant did not appear to be under the influence of drugs or alcohol.  (Tr. 10-16).

Because marijuana plants[1] were found growing in the residence, Warren credibly

---

[1] When the officers discovered marijuana plants were being grown at the residence,  they contacted Gwinnett County who responded with narcotics detectives to take custody of the marijuana plants and the firearms that Defendant stated belonged

4

testified that he asked Defendant about recent drug use. (Tr. 11). According to Warren, Defendant stated he has used marijuana the day before. (Id.). Despite Defendant's admitted drug use, Warren credibly testified that (1) Defendant's answers to questions were context appropriate to the types of questions asked and he was able to understand Defendant's answers; (2) Defendant did not appear to be on any medication; (3) Defendant did not appear to suffer from any mental or emotional impairment; and (4) Defendant was articulate in his responses, maintained eye contact, and seemed fine. (Tr. 12-13, 16). Additionally, Defendant never indicated that he wanted to stop talking to the agents, never requested a lawyer, and the interview itself was conversational. (Tr. 12-13, 16).

During the interview, the agents learned that Defendant had online identities. (Tr. 14-15). Warren credibly testified that he asked Defendant for permission to assume his online identities, and if he would waive ownership of the devices, computers, and cell phones seized from the residence. (Tr. 14, 15). Defendant was presented with and executed a FBI Consent to Assume Online Identity Authorization form, a FBI Waiver of Ownership of Property form for his computer, and a FBI Waiver of Ownership of Property form for multiple devices (two cell phones and three cameras). (Tr. 14-16; see also, Gov't's Ex. 1-3, respectively). When seeking consent from Defendant prior to Defendant executing the forms, Warren testified that he follows the same process every time he administers these forms to a consenting party. (Tr. 16). According to Warren,

_____

to his brother. (Tr. 14, 23).

he sits next to person that he is discussing the form with; he reads the form aloud as they are filling it out; he asks the person to review it themselves; he asks the person to read the last paragraph on the form aloud to ensure that the person can read and understand; and if the person agrees, he asks the person to sign the form. (Id.). Defendant's signature is provided on all three forms. (Id.).

The interview of Defendant was not recorded and lasted approximately forty-five minutes. (Tr. 13-14). The execution of the search warrant lasted about three hours. (Tr. 12-13). Defendant was not arrested and no Miranda warnings were given to him. (Tr. 16, 20).

### B.  Testimony of Defendant Kenneth Perry[2]

Defendant Perry testified that he although he did not finish high school, he obtained his G.E.D. and attended Keuka College before transferring to the Rochester Institute of Technology to study design. (Tr. 27). Defendant testified that he did not get very far in school because he was overwhelmed by the big school, including the larger

---

[2] The Court notes that during Defendant's testimony, Defendant did not sit up straight in his chair; instead Defendant was hunched over, he rocked back and forth, he rarely looked up or made eye contact with either his attorney during direct examination or the AUSA during cross examination. After Defendant testified, the Government recalled Special Agent Warren who testified that Defendant's behavior during his testimony was different from that exhibited during his August 2014 interview with the agents. (Tr. 56). Warren explained that during Defendant's interview, Defendant was sitting upright versus being hunched over; Defendant had consistent eye contact with him and the other agent when they asked questions and were talking to him; Defendant seemed calmer in the sense that he was not rocking or moving back and forth or fidgeting; and Defendant seemed relatively comfortable when interviewed. (Id.). The Court also observes that Defendant's behavior in Court is in stark contrast to the images of Defendant depicted on his Facebook page.

AO 72A
(Rev.8/82)

and louder classrooms. (Tr. 27-28). According to Defendant, he has been diagnosed with Autism Spectrum Syndrome[3] and Sensory Processing Disorder, a part of Autism Spectrum Disorder.[4] (Tr. 28). When asked how long he has been diagnosed with these disorders, Defendant said he did not specifically know, but that he first saw a doctor to get a diagnosis when his health insurance first came through wife's job over five years ago. (Tr. 28-29). While Defendant testified that he was on medication, he admitted that the medication did not prevent him from answering questions, giving testimony, or hearing and understanding what he was being asked. (Tr. 29). On cross examination, Defendant stated he is taking testosterone for hormone replacement therapy, Nexium,[5] Meloxicam,[6] and he was taking Wellbutrin, but recently stopped when he "opted for a

---

[3] Autism spectrum disorder (ASD) is a condition related to brain development that impacts how a person perceives and socializes with others, causing problems in social interaction and communicatio. See Mayo Clinic, http://www.mayoclinic.org/diseases-conditions/autism-spectrum-disorder/home/ovc-20337866 (last visited July 31, 2017). The disorder also includes limited and repetitive patterns of behavior. (Id.).

[4] Sensory processing disorder is a condition in which the brain has trouble receiving and responding to information that comes in through the senses. See WebMD, http://www.webmd.com/children/sensory-processing-disorder#1 (last visited July 31, 2017).

[5] Nexium (generic name Esomeprazole is used to treat certain stomach and esophagus problems (such as acid reflux, ulcers). See WebMD, http://www.webmd.com/drugs/2/drug-20536/nexium-oral/details (last visited July 31, 2017).

[6] Meloxicam is known as a nonsteroidal anti-inflammatory drug used to treat arthritis. See WebMD, http://www.webmd.com/drugs/2/drug-911/meloxicam-oral/details (last visited July 31, 2017).

7

AO 72A
(Rev.8/82)

homeopatic course of action." (Tr. 41).

Defendant also testified that he was unemployed and has been since moving to Georgia from Rochester, New York. (Tr. 29). When asked to describe his work history, Defendant stated he has had a number of jobs over the years, but typically does not do well at work, so he does not hold many of them very long. (Tr. 30). Defendant described his work history in the restaurant industry which included washing dishes, bussing tables, and some part-time banquet serving. (Tr. 30). Defendant explained that the last job he had before moving to Georgia was a dishwasher, and that his manager would allow him to wear headphones and listen to audiobooks[7] while he worked to keep out ambient sound and allow him to focus. (Tr. 29-30).

According to Defendant, he first became aware of law enforcement officers trying to enter his home when he heard an "incessant and loud" knock at the door while he and his wife were in bed. (Tr. 36). Defendant's wife got up, looked out the window, and told him that the circle was full of cop cars, and that there was all kinds of activity outside. (Tr. 37). As his wife rushed down the stairs, Defendant sat up in the bed, and tried to put on his leg brace.[8] (Id.). Defendant testified that although he was wearing only his underwear and trying to put on his leg brace, the officers were shouting for him

---

[7] Defendant testified that he would listen to books by Terry Pratchett, a British author who writes fantasy novels about a world called Discworld. (Tr. 43).

[8] Defendant testified that he was wearing a brace because he fractured his "tibia." (Tr. 42) Specifically, Defendant testified that he experienced a "tibia plateau fracture," when he rear ended a car while riding his motorcycle. (Tr. 42).

8

to come downstairs. (Id.). Defendant tried to tell the officers that he was trying to do so, but he was a cripple. (Id.). Nevertheless, the officers' shouting became more insistent. (Id.). Defendant buckled his leg brace, grabbed a crutch, and went downstairs as quickly as he could. (Id.). The law enforcement officers asked Defendant if he was Kenneth Perry. (Id.). When Defendant responded, "yes," he was quickly ushered out the backdoor of his residence, amid a flurry of agents and officers in full swat gear wearing face masks, bulletproof vests, and carrying weapons. (Tr. 37-38). While on the porch, Defendant stated he saw his wife only briefly as she was being escorted out the front door, and he was told to have a seat at the table on the porch. (Tr. 38). Defendant testified that he told the agents that he was feeling a little thirsty and nauseous, and would like a ginger ale, and was told to stay seated, that they would get it for him. (Tr. 39). According to Defendant, Warren instructed the other agent that was with him to get the ginger ale which was in Defendant's kitchen refrigerator. (Tr. 38-39). After Defendant received the ginger ale, he asked to use the bathroom. (Tr. 39). Agent Warren allowed Defendant to go to the bathroom, but assigned an officer to escort him, and the officer sat outside the bathroom with the door ajar while Defendant urinated. (Tr. 39). Defendant testified that he did not believe that he was free to leave his house. (Tr. 40). Although Defendant remembers signing the FBI Consent and Waiver forms, Defendant alleges he was never told that he had the right to contact a lawyer. (Id.).

On cross examination, Defendant admitted that he was on social media and had a Facebook account prior to the return of the indictment in this case. (Tr. 43). Defendant

identified a number of photos and entries on his Facebook page including a photo of Defendant grilling in a downpour on his deck/back porch[9] (Tr. 43-44; Gov't's Ex. 4); a photo of Defendant wearing a panda bear costume and stretched out in a lounge chair below the caption "another sunny pool day" (Tr. 45; Gov't's Ex. 5); a photo taken by Defendant ("selfie") of him and his wife (Tr. 46; Gov't's Ex. 6); a photo of Defendant's wife's wrist wearing two bracelets - a pearl bracelet and one that appears to be a Pandora bracelet[10] under the caption "Happy Birthday Nancy!" (Tr. 46-47; Gov't's Ex. 7); a photo of Defendant (appearing muscular and shirtless holding a surf or boogie board) and his father in the water at the beach in Wilmington, North Carolina[11] (Tr. 48; Gov't's Ex. 8); a photo of Defendant and his wife at Folly Beach, in Charleston, South Carolina where they were attending a relative's birthday party (Tr. 48-49; Gov't's Ex. 9-10); a photo of both Defendant and his wife's feet, their initials, and a diagram of a heart drawn in the sand at Folly Beach (Tr. 50; Gov't's Ex. 11); a photo of Defendant and his family members enjoying the beach (Tr. 50-51; Gov't's Ex. 12); a photo of Defendant in an

_____

[9] Defendant admitted that he does all of the cooking at his house and that his wife does not cook. (Tr. 45).

[10] Despite the photo of the bracelets and the caption "Happy Birthday Nancy" on Defendant's Facebook page as well as comments offering congratulations, presumably on the selection and/or purchase of the birthday gift for his wife, Defendant testified that the bracelet was not a gift from him. (Tr. 47). Instead, Defendant alleges his wife brought the pearl bracelet for herself while traveling for business. (Id.).

[11] Based on Defendant's muscular appearance, Defendant was asked if he works out or goes to the gym frequently. (Tr. 48). Defendant testified that at that time he was going to the gym very frequently. (Id.).

AO 72A
(Rev.8/82)

aisle at Hobby Lobby dressed in a red, white, and blue top hat, boa, and ribbons and holding other red, white and blue paraphernalia under the caption "Memorial Day" (Tr. 51-52; Gov't's Ex. 13); and a photo of Defendant and his wife shopping in the Louis Vitton store in Lenox Mall (Tr. 52; Gov't's Ex. 14). Defendant testified that the day the photo of him and his wife shopping at Lenox Mall was taken was a "particularly tedious and painful day" because he generally does not go to malls as they are a "bit of a problem for him." (Tr. 52).

On re-direct, Defendant testified that all of the photos on his Facebook page are of him and family members because he does not have any "in-person friends" but he has a great number of virtual (i.e. Facebook) friends.[12] Defendant also testified that he does not go the beach often, and that besides family trips for birthdays and visits to his father, he typically does not go places. (Tr. 54). Defendant also explained his gym usage by stating that after his injury (presumably resulting from the motorcycle accident), he was in physical rehabilitation, and that his rehabilitation specialist instructed him to work out on his own. (Tr. 55). Defendant further explained that he also worked out frequently for his mental health because it is soothing to do repetitive motions. (Id.). According to Defendant, repetitive activity that does not involve any kind of athletic ability, simply picking things up and putting them down, is something that is good for his frame of mind. (Id.). Defendant testified that the gym is one of the only places that he goes

---

[12] According to Defendant's Facebook page, Defendant had at least 1,330 friends before closing his account. (Gov't's Exs. 4-14).

AO 72A
(Rev.8/82)

outside of the house since he generally does not like to go a lot of places.  (<u>Id.</u>).

## II.   <u>LEGAL ANALYSIS</u>

Defendant argues the statements he made to federal agents should be suppressed because the agents failed to inform him of his <u>Miranda</u> rights prior to commencing interrogation and his statements were made while he was in custody being interrogated. In support, Defendant points out (1) that while he and his wife were sleeping, a team of over fourteen law enforcement officers incessantly and loudly pounded on his door early in the morning to execute a search warrant; (2) Defendant was immediately separated from his wife, and remained separated from her for the duration of the execution of the search warrant and interrogation; (3) law enforcement agents, clad in full SWAT gear and bulletproof vests, streamed into his home with guns drawn; (4) law enforcement agents ordered Defendant, who was wearing a metal leg brace, to come downstairs; (5) law enforcement agents confronted Defendant on the stairs and ushered him out the back door of his house; (6) Defendant was ordered to the back deck of his house for an interview with law enforcement; (7) Defendant was ordered to sit; (8) Defendant was denied the freedom to retrieve a ginger ale soda from his refrigerator; (9) Defendant felt compelled to ask permission to use the restroom in his home; (10) law enforcement agents, in opposition to Defendant's will, commanded Defendant to keep the door ajar while he used the restroom; (11) law enforcement agents monitored the open restroom while Defendant urinated; (12) Defendant's cell phone was seized and remained in the custody of law enforcement; and (13) Defendant did not believe that he was free to leave

12

the house. Defendant contends that short of an arrest, it is difficult to imagine a more police-dominated, custodial situation. Defendant also argues, from his perspective as one who suffers from autism spectrum disorder and faces difficulty in environments with a "lot of people" and "a lot going on," there is no evidence to traverse his assertion that he was forced to urinate with the bathroom door open.

In response, the Government contends that Defendant's non-custodial statements are admissible at trial because Defendant was never in custody on August 7, 2014. The Government argues the agents were not required to provide <u>Miranda</u> rights to Defendant because the interview of Defendant did not amount to an arrest. The Government also argues <u>Miranda</u> warnings were not necessary because Defendant was told he was not under arrest; he was told that did not have to answer any questions and was free to leave; he was informed of his right to refuse to answer questions and that he could change his mind and stop answering questions, even if he initially chose to answer questions; Defendant was interviewed on the back deck of his own home, a comfortable and familiar environment; Defendant was not physically harmed, restrained, or threatened; and although both agents were carrying weapons, the weapons were out of sight, and neither agent drew a firearm during the interview.

### A.    <u>Defendant Was Not in Custody for Purposes of Miranda</u>

Having read and considered the arguments provided by both parties, the undersigned finds Defendant was not entitled to <u>Miranda</u> warnings because he was not

in custody when he voluntarily provided statements to law enforcement agents.[13]

The Fifth Amendment of the United States Constitution prohibits the use of an involuntary confession against a defendant in a federal criminal trial. U.S. Const. amend. V; Dickerson v. United States, 530 U.S. 428, 433 (2000); Bram v. United States, 168 U.S. 532, 542 (1897). In Miranda v. Arizona, 384 U.S. 436 (1966), the Supreme Court recognized the need to further safeguard the privilege against self-incrimination by requiring that Miranda warnings, or other fully effective means, be given to subjects of custodial interrogations. Miranda, 384 U.S. at 478-79; see also Dickerson, 530 U.S. at 442-43 (rejecting Congress' attempt through 18 U.S.C. § 3501 to reinstate the totality test as sufficient).

The "Miranda safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent." Rhode Island v. Innis, 446 U.S. 291, 300-01 (1980). To determine whether a suspect is in custody, and thus entitled to a reading of his Miranda rights, a Court considers the totality of the circumstances surrounding the interrogation and whether, given those circumstances, a reasonable person in the suspect's position would feel a restraint on his freedom of movement to such an extent that he would not feel free to leave. J.D.B. v. North Carolina, 131 S. Ct. 2394, 2402 (2011); United States v. Brown, 441 F.3d 1330, 1347

---

[13] Likewise, this Court finds Defendant was not in custody when he was presented with and executed a FBI Consent to Assume Online Identity Authorization form, a FBI Waiver of Ownership of Property form for his computer, and a FBI Waiver of Ownership of Property form for multiple devices.

14

(11th Cir. 2006); United States v. Muegge, 225 F.3d 1267, 1270 (11th Cir. 2000) (holding that absent a formal arrest, a court can only conclude that a suspect is in custody when, "under the totality of the circumstances, a reasonable man in the suspect's position would feel a restraint on his freedom of movement fairly characterized as that 'degree associated with a formal arrest' to such extent that he would not feel free to leave."). The test is objective; neither the suspect's nor the officer's actual, subjective views are relevant. J.D.B., 131 S. Ct. at 2402; Peoples v. Campbell, 377 F.3d 1208, 1228-29 (11th Cir. 2004). The court looks to the perspective of a "reasonable innocent person" when making this determination. United States v. Moya, 74 F.3d 1117, 1119 (11th Cir. 1996). In considering the totality of the circumstances, "[n]o particular fact in the 'custody' analysis is outcome determinative—[the court] simply weigh[s] the totality of the circumstances." United States v. Lall, 607 F.3d 1277, 1284 (11th Cir. 2010) (quoting Brown, 441 F.3d at 1349). Factors to be considered include "the location of the questioning, its duration, statements made during the interview, the presence or absence of physical restraints during the questioning, and the release of the interviewee at the end of the questioning." Howes v. Fields, 132 S. Ct. 1181, 1189-90 (2012) (internal citations omitted). Other relevant circumstances noted by the Eleventh Circuit include whether and how the officers brandished weapons, touched the suspect, or used language or a tone that indicated that compliance with the officers could be compelled, as well as the location and duration of the search. United States v. Luna-Encinas, 603 F.3d 876, 881 (11th Cir. 2010); United States v. Street, 472 F.3d 1298, 1309 (11th Cir. 2006) (quoting

15

United States v. Long, 866 F.2d 402, 405 (11th Cir. 1989)).  Additionally, whether law enforcement officers advised the suspect that he is not under arrest is of "substantial importance in determining whether a reasonable person would have felt free to leave." Muegge, 225 F.3d at 1271; see also Peoples, 377 F.3d at 1228-29.  Furthermore, in United States v. Muegge, 225 F.3d at 1271, the Eleventh Circuit held that a suspect who is "unambiguously advised" that he is free to go, is in the absence of evidence to the contrary, not in custody. An exception occurs where "the restraints . . . are 'so extensive that telling the suspect he was free to leave could not cure the custodial aspect of the interview.'"  Id.

Also, Courts consider the location and duration of the questioning.  Regarding an in-home questioning, courts within the Eleventh Circuit are "much less likely to find the circumstances custodial when the interrogation occurs in familiar or at least neutral surroundings, such as the suspect's home."  United States v. Gomes, 279 F. App'x 861, 868 (11th Cir. 2008) (quoting Brown, 441 F.3d at 1348); see also United States v. Newton, 369 F.3d 659, 675 (2d Cir. 2004) (holding that "interrogation in the familiar surroundings of one's own home is generally not deemed custodial."); United States v. Cerreta, 63 F. App'x 585, 587 (2d Cir. 2003) (opining that an interview conducted in a bedroom during which the door was closed but unlocked and unblocked does not constitute custodial interrogation).

While the government bears the burden of showing that statements were obtained in compliance with the dictates of Miranda and were otherwise voluntary, the defendant

16

first bears the burden of establishing that he was in custody and that his statements were made in response to government questioning. Missouri v. Seibert, 542 U.S. 600, 608 n.1 (2004); United States v. de la Fuente, 548 F.2d 528, 533 (5th Cir. 1978) ("[I]f a defendant shows that a confession was obtained while he was under custodial interrogation, the government then has the burden of proving that the defendant voluntarily waived his privilege against self-incrimination.");[14] see also United States v. Peck, 17 F. Supp. 3d 1345, 1353-54 (N.D. Ga. 2014) (lengthy discussion that de le Fuente still requires defendant first carry the burden in showing he was in custody and that Miranda warnings are necessary).

Applying the law to the facts of this case, this Court concludes that the agents were not required to read Miranda rights to Defendant when the agents questioned him. A weighing of the totality of the circumstances leads to a conclusion that Defendant was not in custody for Miranda purposes for a number of reasons. First, the interview took place at Defendant's home. Courts within the Eleventh Circuit are "much less likely to find the circumstances custodial when the interrogation occurs in familiar or at least neutral surroundings, such as the suspect's home." See United States v. Matcovich, 522 F. App'x. 850, 851 (11th Cir. 2013) (per curiam) (quoting Brown, 441 F.3d at 1348); Newton, 369 F.3d at 675 (holding that "interrogation in the familiar surroundings of one's own home is generally not deemed custodial."); Cerreta, 63 F. App'x at 587

_____

[14] In Bonner v. City of Prichard, 661 F.2d 1206, 1207 (11th Cir.1981), the Eleventh Circuit adopted as binding precedent all decisions rendered by the United States Court of Appeals for the Fifth Circuit prior to September 30, 1981.

AO 72A
(Rev.8/82)

(opining that an interview conducted in a bedroom during which the door was closed but unlocked and unblocked does not constitute custodial interrogation). Even in a "police-dominated atmosphere," the fact remains that Defendant was interviewed in the "familiar surrounding," of his residence, which "strongly militates" against a finding of custodial interrogation. United States v. Graham, No. 3:13-CR-11-TCB, 2014 WL 2922388, at *7 (N.D. Ga. June 27, 2014) (citing and quoting United States v. Rodgers, No. 1:09-CR-544-TWT-ECS, 2010 WL 2721883, at *2 (N.D. Ga. June 9, 2010), adopted sub nom., 2010 WL 2697084, at *1 (N.D. Ga. Jul. 7, 2010)). Here, the Court recognizes that the environment wherein Defendant was questioned may have been somewhat restrictive since Defendant, wearing a metal leg brace, was separated from his wife. In that same vein, this Court recognizes the Supreme Court's suggestion that isolation from one's family may contribute to a coercive atmosphere by preventing family members, friends, and others who may be sympathetic from providing either advice or emotional support, and without any such assistance, the person who is questioned may feel overwhelming pressure to speak and to refrain from asking that the interview be terminated. Howes, 132 S. Ct. at 1191. In this case, however, there is no evidence that the agents blocked Defendant's access to the door or otherwise forced or coerced him to go outside onto the private back deck of his residence. Instead, Warren credibly testified that Defendant was simply asked to step outside onto the deck for an interview.[15] Even if Defendant was

---

[15] The Court finds Defendant's testimony less than credible for a number of reasons including, but not limited to, Defendant's appearance in Court and his testimony were diametrically different from the images of Defendant on his Facebook

AO 72A
(Rev.8/82)

told to have a seat and directed where to have a seat on the back deck, there is no evidence that these actions were undertaken with any force, much less more than minimal force. Given that the interview took place on a private back deck at Defendant's residence where he felt comfortable, and given the sensitive subject matter – child pornography – a reasonable innocent person would not conclude that being questioned behind closed doors away from his wife who was home at the time the officer arrived was tantamount to being arrested. United States v. Peck, 17 F. Supp. 3d 1345, 1361 (N.D. Ga. 2014) (although defendant was isolated from his family in a closed bedroom with multiple agents, holding that interview about child pornography in a private setting at one's residence weighed against a finding of custodial interrogation) (citing Berkemer v. McCarty, 468 U.S. 420, 441 (1984)); see also Brown, 441 F.3d at 1348-50 (interview at residence was not rendered custodial when defendant was not allowed to retrieve his shoes and did not want to leave barefooted). Thus, the Court concludes that interviewing Defendant on the back deck of his residence does not weigh in favor of custody.

Second, Defendant was affirmatively told he was not under arrest, that he was free to leave. Special Agent Warren credibly testified that before the interview started, Defendant was advised that he was not under arrest, that he did not have to answer any questions, that he was free to leave and if he decided to answer any questions, he could

---

page. Moreover, Defendant's testimony was inconsistent. For example, Defendant testified that he does not like going places and likes doing things that do not involve athletic ability. Defendant, however, admitted he works out at a gym frequently and that he owns and rides a motorcyle.

AO 72A
(Rev.8/82)

stop answering them if he wanted to do so. (Tr. 9, 10). There is no indication from the testimony during the evidentiary hearing, that Defendant misunderstood Warren's assurance that he was not under arrest and was free to leave.[16] See United States v. Asher, No. 1:09-CR-414-JOF-AJB, 2010 WL 4192883, at *11 n.20 (N.D. Ga. Feb. 25, 2010) (rejecting the argument that defendant did not know he was not in custody when he was told repeatedly that he was not under arrest, yet not explicitly informed that he was "free to leave"), R. & R. adopted, 2010 WL 4237579 (N.D. Ga. Oct. 21, 2010). Moreover, at no time did Defendant ask or attempt to leave, seek to avoid questions, end the interview, ask for an attorney, or otherwise request to seek counsel from anyone. Instead, Defendant chose to continue to engage in the conversation, despite being informed by the agents, unambiguously, of his right to refuse to speak with them. Defendant does not dispute that after Warren ushered him from the stairway to the back of the house onto the deck and that he was advised that he was free to leave and that he did not have to stay. (See Doc. 28 at 5). "Unambiguously advising a defendant that he is free to leave and is not in custody is a powerful factor in the mix, and generally will lead to the conclusion that the defendant is not in custody absent a finding of restraints that are 'so extensive that telling the suspect he was free to leave could not cure the custodial aspect of the interview.'" Brown, 441 F.3d at 1347 (quoting Muegge, 225 F.3d at 1271). Furthermore, at the conclusion of the interview, Defendant was not arrested.

---

[16] To the extent that Defendant infers that his autism spectrum disorder or any other condition impaired his ability to understand that he was not under arrest, was free to leave, and did not have to answer any questions, the Court is not persuaded.

20

Instead, Defendant was not prevented from returning to the house to be with his wife.

Third, the interview itself did not show signs of any agent or law enforcement officer exerting undue coercion. Prior to and during the interview, the agents did not threaten Defendant, require him to get on the ground, draw their weapons, use handcuffs or otherwise restrain him, or force him to speak with them. The record does not reflect that Defendant's person was searched, patted down, or that he was asked to remove any items from his possession at any time. While the law enforcement officers were indeed armed and displaying their firearms at the initiation of the search warrant, at the time of the interview of Defendant both agents' weapons were out of sight, and neither agent brandished their firearm or physically touched Defendant during his interview. Thus, the fact that law enforcement agents had their weapons drawn upon entering and securing the house does not militate towards a finding that Defendant was in custody during the interview because no firearms were brandished while Defendant was being questioned. Nor did the presence of police officers (even armed ones) wearing bullet-proof vests create a custodial situation envisioned by Miranda. See Howes, 132 S. Ct. at 1189; United States v. Luna-Encinas, 603 F.3d at 876, 881; see also United States v. Moya, 74 F.3d 1117, 1119 (11th Cir. 1996) (concluding that defendant was not in custody, and citing United States v. Blackman, 66 F.3d 1572, 1576-77 & n.4 (11th Cir. 1995), for the proposition that even handcuffing and holding a suspect at gunpoint would not necessarily constitute custody).

Furthermore, contrary to Defendant's allegations, the restraints on his freedom of

movement are insufficient to transform the interview into a custodial interrogation. Defendant argues his movements were restricted during the interview because he was not able to "limp freely into his own home and obtain his own beverage," and because his bathroom usage was monitored. (Doc. 19 at 18). The Eleventh Circuit has found no custody where, as here, a defendant did not have free rein of his home which was being searched by warrant. United States v. Maldonado, 562 F. App'x 859, 861 (11th Cir. 2014); United States v. Opoku, 210 F. App'x 848, 852 (11th Cir. 2006). Moreover, by Defendant's own admission, when he said he was thirsty and nauseous, one of the agents retrieved a ginger ale for him from Defendant's refrigerator. Instead of having Defendant "limp" to and from the refrigerator, Warren credibly testified that because Defendant was wearing a metal brace on his leg as a result of a motorcycle accident, it seemed to be the polite thing to do to have an officer get a drink for him. Although Defendant argues his movements were monitored because he was escorted by an officer to the bathroom and required to leave the door ajar while he urinated, that fact does not point to a conclusion that Defendant was in custody. In Maldonado, 562 F. App'x 859 (11th Cir. 2014) where the defendant was escorted to the bathroom, the Eleventh Circuit held that since the defendant's movements were not restricted and she was advised that she was free to leave, no custody was established. Maldonado, 562 F. App'x at 862; see also United States v. Opoku, 210 F. App'x. 848, 852 (11th Cir. 2006) (holding that escorting a subject around his own home while it is searched does not create a custodial situation).

AO 72A
(Rev.8/82)

Further, the tone of the interview was conversational rather than accusatory. As previously noted, the agents explicitly informed Defendant that he was not under arrest; that he was under no obligation to speak with them; that he could leave the interview; that he could refuse to answer questions; and if he decided to answer any questions, he could stop answering them if he wanted to do so. Defendant remained calm and conversational, he never asked to terminate the interview or speak to an attorney. Instead, despite the assurance that he was not under arrest, Defendant affirmatively chose to: (1) continue to engage in the interview; (2) execute waivers of ownership in the property seized pursuant to the search warrant; and (3) consent to the agents assuming his online identity. (Gov't's Ex. 1-3). Thus, this Court finds that Defendant executed the waivers of ownership and provided his consent to allow the agents to assume his identity "freely and voluntarily, without fear, threats, coercion, or promises of any kind." See United States v. Qose, No. 16-11098, 2017 WL 510429, at *2 (11th Cir. Feb. 8, 2017) (finding that one factor that the defendant was not in custody was that he "signed a consent form 'freely and voluntarily without fear of threats; coercion, or promises of any kind,' allowing the FBI to assume his online identity"). Accordingly, there is no indication that there were restraints on Defendant's freedom of movement "that [were] so extensive that telling [him] he was free to leave could not cure the custodial aspect of the interview. See Brown, 441 F.3d at 1347-48.

Finally, the duration of the entire interview of Defendant was approximately forty-five minutes. Interviews conducted for even longer periods have been found to be non-

23

custodial.  See Yarborough v. Alvarado, 541 U.S. 652, 655-58 (2004) (suspect not in custody when his parents brought him to station at detective's request, he was interviewed in small room for two hours by one detective, interview was recorded, and detective pressed suspect to reveal details of crime by appealing to his "sense of honesty").  Similarly, the Eleventh Circuit and its district courts have also found even longer periods of questioning do not constitute custody for Miranda purposes.  United States v. McDowell, 250 F.3d 1354, 1362 (11th Cir. 2001) (four hours); Muegge, 225 F.3d at 1269-71 (defendant interviewed for about two and a half hours); Tukes v. Dugger, 911 F.2d 508, 515-16 (11th Cir. 1990) (one hour); United States v. Peck, 17 F. Supp. 3d 1345, 1361 (N.D. Ga. Apr. 18, 2014) (one hour); United States v. Asher, No. 1:09-cr-414-JOF-AJB, 2010 WL 4192883 (N.D. Ga. Feb. 25, 2010) (R & R), R&R adopted 2010 WL 4237579 (N.D. Ga. Oct. 21, 2010) (Duffey, J.) (defendant detained two and a half hours, but interviewed for forty-five minutes); United States v. Manta-Carillo, No. 11-00103-CB, 2011 WL 3235757, at *2, *4 (S.D. Ala. July 28, 2011) (finding no custody where, among other things, the interview lasted about an hour and a half).  Accordingly, the duration of the interview of Defendant points to it being non-custodial.  In sum, because the circumstances surrounding Defendant's statements do not rise to the level of custodial interrogation, no Miranda warnings were necessary.

Additionally, the Court notes that in spite of the plethora of cases within the Eleventh Circuit regarding non-custodial statements, the Defendant relies heavily on cases from other circuits to support his claim that he was in custody and entitled to

AO 72A
(Rev.8/82)

<u>Miranda</u> warnings. Obviously, case law from other circuits is not binding on this Court. Based on ample precedent within the Eleventh Circuit, as discussed above, the restrictions placed on Defendant and his wife were much less than those found to amount to custody in the cases relied on by Defendant. <u>See</u> <u>United States v. Hashime</u>, 734 F.3d 278, 280-81 (4th Cir. 2013) (defendant and family kept in living room during sweep and not allowed to go to bathroom; defendant given his clothes but not shoes or socks; defendant's mother who was recovering from brain surgery was not allowed to go and lie down; and his family was not allowed to see defendant during the three-hour interrogation); <u>United States v. Colonna</u>, 511 F.3d 431, 436 (4th Cir. 2007) (agent instructed defendant's mother in defendant's presence that she could not smoke in her own house and if she chose to go outside to smoke, she could not reenter the home).

Lastly, to the extent also Defendant relies on other cases from the First and Ninth Circuits to support his argument that he was is custody for purposes of <u>Miranda</u>, this Court finds those cases are not analogous to the facts of this case. <u>See</u> <u>United States v. Mittel-Carey</u>, 493 F.3d 36, 38 (1st Cir. 2007) (interviewing agents told defendant that he did not have to answer questions, but then qualified this by telling him that persons who cooperated fared better; explained acceptance of responsibility under the Sentencing Guidelines; and when the defendant wondered if he should get an attorney, agent cautioned against getting a lawyer); <u>see also</u> <u>United States v. McKany</u>, 649 F. App'x 553, 555 (9th Cir. 2016) (defendant who was handcuffed prior to the interrogation, assisted into a pair of pants, closely monitored, and who expressed some hesitation about

25

speaking with the officers, was found to have been in police custody in a police dominated-atmosphere).  Accordingly, this Court finds that Defendant's reliance on cases from other circuits including the Fourth, First and Ninth Circuits are misplaced.

**B.** **Defendant's Computer and Its Contents Were Lawfully Seized and Searched**

Defendant also argues this Court should suppress the contents of his computers and devices seized pursuant to a lawfully executed search warrant.  Specifically, in spite of existing law to the contrary, and perhaps in an effort to get around the search warrant as well as the executed FBI consent and waiver of ownership forms, Defendant argues the law should change to require a second search warrant to search the contents of a seized computer if the original search warrant only authorized law enforcement agents to "search for and seize" the computer.  Defendant further argues the search warrant should not be found sufficiently particular to authorize a search of the computer. Notably, Defendant does not allege that the search warrant application or affidavit lacked probable cause or that the warrant was unreasonable or overbroad.

As acknowledged by Defendant, Rule 41(e)(2)(B) of the Federal Rules of Criminal Procedure addresses the situation at hand.  Fed. R. Crim P. Rule 41(e)(2)(B). Rule 41(e)(2)(B) allows for a later off-site search of items seized pursuant to a warrant seeking electronically stored information ("Unless otherwise specified, the warrant authorizes a later review of the media or information consistent with the warrant."). This portion of Rule 41 was amended in 2009, and the amendment explains the practical need for the rule: "This rule acknowledges the need for a two-step process: officers may seize

26

or copy the entire storage medium and review it later to determine what electronically stored information falls with the scope of the warrant."  Additionally, as Defendant candidly admits, however, federal courts have generally not required a second warrant to search a properly seized computer "where the evidence obtained in the search did not exceed the probable cause articulated in the original warrant."  See United States v. Ilonzo, No. 1:12-CR-276-SCJ-GGB, 2015 WL 5827598, at *19 (N.D. Ga. Oct. 6, 2015), quoting United States v. Evers, 669 F.3d 645, 653 (6th Cir. 2012) (and cases cited therein); see also United States v. Munroe, 421 F.2d 644, 646 (5th Cir. 1970) (holding, more generally, that evidence was validly seized during a search where the evidence was "reasonably related to the offense which formed the basis for the search warrant.").  In this case, there is nothing to indicate that the evidence obtained pursuant to the search exceeded the probable cause articulated in the original warrant.  Moreover, where as here, the warrant and accompanying affidavit make clear that the objective of the search includes the contents of a computer, the search of the computer's files does not exceed the warrant. See United States v. Beckett, 369 F. App'x 52, 57 (11th Cir. 2010) (unpublished).  Because the search of the computer and other devices here were related to the offenses described in the warrant, no additional warrant was required. Cf. United States v. Kearns, No. 1:05-cr-146-WSD, 2006 WL 2668536, at *3-4 (N.D. Ga. Sept. 15, 2006) (finding, where warrant concerned fraud, agents' cursory search of files contained on computer for evidence of fraud was permissible, and pornographic images discovered during that search were admissible in later child pornography prosecution despite no

AO 72A
(Rev.8/82)

contemporaneous warrant to search for pornography). Defendant has not cited to any case that suggests that the Court should not follow the general rule that a second warrant was not required to search the contents of their computers. Thus, Defendant's computers and other devices were seized and searched pursuant to a valid warrant. Accordingly, Defendant's Motions to Suppress Evidence and Statements should be **DENIED**. (Doc. 14, 15).

**<u>CONCLUSION</u>**

Based on the foregoing reasons, the Court **RECOMMENDS** that Defendant's Motion to Suppress Evidence and Statements be **DENIED**. (Doc. 14, 15). As there are no further motions pending, the undersigned certifies this case ready for trial. The Clerk is directed to terminate the reference to the undersigned.

**SO REPORTED AND RECOMMENDED**, this ___4___ day of August, 2017.

/s/LINDA T. WALKER
LINDA T. WALKER
UNITED STATES MAGISTRATE JUDGE

AO 72A
(Rev.8/82)